**UNITED STATES of America ex rel. Andrew PERKINS, Plaintiff,**

v.

**SARA LEE CORPORATION, Defendant.**

Civ. A. No. 93–0002–M–C.

United States District Court,
W.D. Virginia,
Charlottesville Division.

Dec. 1, 1993.

Richard Hustis Milnor, Taylor & Zunka, Charlottesville, VA, for plaintiff.

Matthew Brundred Murray, Richmond and Fishburne, Charlottesville, VA, for defendant.

## OPINION

MICHAEL, District Judge.

On March 17, 1993, this court found probable cause to appoint counsel to represent Andrew Perkins in his complaint that his employer violated 28 U.S.C. § 1875(a) by threatening to discharge him, intimidating him, coercing him and actually discharging him because he served as a juror in a five-week trial before this court. A bench trial was held on April 29, May 10 and 14, 1993. After careful consideration of all of the evidence, the court finds for the plaintiff.

### I.

Andrew Perkins began working for L'Eggs Products, Inc., Division of Sara Lee Corporation ("Sara Lee"), in July of 1989. He was originally hired as a "route relief" worker, but later received his own route as a salaried "Sales Merchandiser," responsible for delivering, displaying, and billing L'Eggs hosiery. On a 12–day cycle, Perkins covered a territory including Charlottesville, Orange, Culpeper, Louisa, Luray and most of Lynchburg, Virginia. Using a company van, he loaded Sara Lee's product at the drop-off point in Lynchburg, then delivered the product over the following two days. He set his own hours and worked autonomously. At the

time of his jury service in this court, Perkins was a permanent Sara Lee employee.

Perkins appears to have been a diligent employee, and the court notes in this regard that he took no sick days throughout 1992. More than this, Perkins was repeatedly commended for his work. On September 28, 1990, he received a letter from Ron Zabel, President of L'Eggs, lauding his achievement of a 99.1% calls made rating, and on September 27, 1991, he received a similar letter for achieving a 99.8% calls made rating. Sara Lee commended Perkins for his driving ability on April 11, 1990. Most significantly, his Sales Quarterly Performance Summaries displayed a consistent pattern of meeting or exceeding the company's expectations. His last Summary prior to trial, for the period ending September 30, 1992, indicates that he exceeded expectations, scoring 90 out of a possible 100 points. For the period from October 1, 1992 to December 31, 1992, the period encompassing his jury service, Perkins was rated "Meets Expectations." That Summary, which Perkins did not see until his personnel file was subpoenaed for this case, was signed by Senior Area Manager Mike Kaiser, but not by Perkins' supervisor, Trish Wright.

Sara Lee's January 15, 1992, Succession Plan identified Perkins as having the potential to become a district sales manager within one year. Sara Lee points out, however, that due to declining performance, Perkins was removed from consideration under this Plan in September, 1992, prior to his jury service. Sara Lee points in particular to the period from April 1, 1992 to June 30, 1992, in which Perkins was rated at the low end of the "Meets Expectations" category. The court notes, however, that Perkins received a similar rating in the October 30, 1991 to December 31, 1991 period, yet was placed on the Succession Plan some two weeks later. It is unnecessary for the court to ascertain Perkins' caliber as an employee with any precision. Suffice it to say that Perkins' performance was more than adequate throughout his career. From the time he began working for Sara Lee until he was selected for jury duty, Perkins received no written repri-

mands, corrective action notices, or any other negative memoranda.

Perkins and his wife, Suzanne, live in Faber, Virginia. Perkins' sister-in-law, Anna Steffy, and her daughter, Carlie, came to live with the Perkinses at the end of August, 1992. When Carlie started school in September, 1992, she was afraid to walk the two miles from the nearest bus stop to their home. Both Steffy and Suzanne Perkins worked until 4:30 or 5:00 p.m. each day. Steffy could drive Carlie to the bus stop in the morning, but she could not make it home in time to pick her up in the afternoon. Because Perkins set his own hours, he began to pick Carlie up and take her home; he would then return to his rounds. His then-supervisor, Gertie Crisco, approved of the activity before it began.

While his work for Sara Lee constituted his main employment, Perkins began a second job to meet the unforeseen expenses of financing his home, which he had recently purchased. He told Crisco that he would need his second job for two years, and was informed that the company approved so long as his second job did not interfere with his work for Sara Lee. Perkins began working 20 hours a week for K–Mart, at minimum wage, on weeknights and Saturdays. Later, he left K–Mart for another job paying $6.00 per hour at an establishment called the Trading Post. When Perkins gave K–Mart notice, Gregory Crooks, Fashion Manager at K–Mart, was away. Perkins asked to be taken off the schedule until Crooks returned, so that he could give him proper notice. When Crooks returned, however, he fired Perkins for taking "unauthorized leave." Crooks testified that he had not heard that Perkins had received permission not to work pending Crooks' return.

In July, 1992, Sara Lee restructured throughout the East Coast to balance its routes. At that time, Perkins was placed under a new supervisor, Trish Wright, who is a District Sales Manager. Perkins had heard that Wright "ruled with an iron hand," and that the Richmond office had numerous personnel problems under her direction. Perkins asked Gerald Mallgren, Regional Director of Retail Operations, for a transfer to

another supervisor. Mallgren answered that, for business reasons, Perkins had to remain under Wright's supervision. Perkins later came to feel comfortable about his relationship with Wright.

Though Perkins had known Wright since he started with the company, he first met her as his new supervisor on August 1, 1992, at his drop-off point in Lynchburg. At that time, Perkins explained his financial situation, including the need for his second job. In addition, he informed Wright that he intended to use the company van to pick up his niece at the bus stop when school started. Wright told him that she would determine if company policy would permit these actions, and that she would inform him of her decision. During this first meeting, Perkins did not wear the company uniform, but Wright did not question him about it.

On October 27, 1992, this court notified Perkins to report for jury duty. Perkins called Wright to tell her he had to report, and that the trial was expected to last three weeks. Wright later telephoned Perkins and left a message with his sister-in-law saying that Wright needed to speak with Perkins "about getting out of jury duty." Wright asked Perkins to send her a copy of the court's letter telling him to report for jury duty, and told him that Mike Kaiser, a Senior Area Manager and Wright's supervisor, would send him a letter to present to the court.

On October 30, 1992, Perkins received a faxed letter written by Mike Kaiser, on L'Eggs Products stationary, which stated:

Andrew Perkins, our employee, has received a notice to appear for jury duty. He is the only L'Eggs person that works in the Charlottesville area. Part of his salary is based on his sales and for him not to be working for three weeks would create a financial hardship for him. Please excuse him from jury duty at at [sic] this time.

Kaiser stated that Wright told him Perkins wanted to be excused, and that Perkins had asked if the company could do something.

Perkins denied asking Wright any such thing; he went along with Wright as much as he could because he believed his employer did not want him to serve on a jury.

Kaiser knew that Sara Lee had written letters to courts on other occasions attempting to have its employees excused. Importantly, Kaiser's letter failed to state that route relief was available to keep Perkins' route current during the trial. Kathy Walsh, Regional Manager of Human Resources and Training, helped Kaiser prepare this letter. She stated at trial that Sara Lee's business can suffer when the company must use route relief to substitute for the Sales Merchandiser who regularly covers the route.

Perkins did not submit the proposed letter to the court because he believed it set forth no legitimate reason for him not to serve. The letter incorrectly stated that part of Perkins' salary was based on his sales, and that jury duty would create a financial hardship for him. Kaiser stated that he believed this statement to be true because even though Perkins was on salary, he still had a bonus potential. He knew, however, that Perkins had not received such a bonus, and that any sales made by route relief during his jury service would be credited toward a bonus for Perkins.

On November 2, 1992, Perkins was selected to serve on the jury in the case of *United States of America v. Michael Shifflett, et als,* Crim. Action No. 91–033–C. When Perkins called Wright to inform her, she told him that although she was in the process of hiring a route relief person, there was no relief immediately available, and she did not know what the company would do. She testified that Perkins did not ask her if route relief would be made available, but only if she had it at that time.

To allay Wright's distress somewhat, Perkins volunteered to run his Day 3 calls while serving on the jury. Day 3 had fewer calls and did not require weekly service. Unfortunately, Perkins did not realize how much time and energy his jury service would require.[1] Normally, Perkins would wake up

---

1. There is no doubt that the jury Perkins was asked to serve on was extraordinary. The criminal trial in the *Shifflett* case involved six defendants and multiple counts, and was the longest

between 2:00 a.m. and 3:00 a.m. to load his van in Lynchburg. During the trial, however, he needed to arrive at the courthouse early. As a result, he could not make deliveries before trial. In addition, trial lasted until 5:00 p.m. each day, leaving little time in the evening for him to make his rounds.

Perkins was surprised to find that route relief was indeed available to run his calls, beginning with the first day of trial. Unbeknownst to him, there was relief as close as Woodbridge, Virginia and, failing that, in Washington and Baltimore. He tried the first week of trial to service his Day 3 calls, but could not do them properly. Perkins called Wright and left a message on her answering machine to the effect that he could no longer work while on jury duty. Wright was delayed in the process of moving to her new home, and could not be reached at the numbers she had given Perkins. He did leave a message with Wright's son, and left another message for Wright in the Richmond office. Wright did not answer these messages. Although she spoke with Perkins on November 18, 1992, Perkins did not mention his inability to perform his calls at this time. He admitted that after leaving the messages and not hearing from her, he forgot to tell her. In fact, Wright did not speak with Perkins about his Day 3 calls until November 22, 1992.

Thus, even though the company had no trouble obtaining route relief for the other days of Perkins' route, his Day 3 calls were not covered for the first three weeks of the trial.[2] Perkins was able to continue his work at the Trading Post during his jury duty, however, because his working hours were on weekday evenings and Saturdays. The record reveals that during the trial, Perkins worked a total of 63 hours in two pay periods spanning 28 calendar days, from November 4 to November 18, 1992, and from November 18 to December 2, 1992.

On November 22, 1992, Perkins explained to Wright his problems working for Sara Lee during jury service. She became angry and told him he would have to complete his calls that week even if he had to work on Saturday. Perkins worked on Saturday to complete his calls. Manual Jessup, Director of Employee Relations for L'Eggs, admitted at trial that while employees may volunteer to continue work during jury duty, requiring them to do so would be wrong. After Thanksgiving, Wright herself provided route relief for Perkins' Day 3 calls.

The trial to which Perkins was assigned lasted from November 2, 1992, until December 7, 1992. On December 8, 1992, Wright pulled Perkins from his route and had him meet her in Lynchburg. Perkins had never been pulled from his route before. Wright then reviewed his inventory, which the numerous route relief persons had left in complete chaos when delivering and removing stock. Route relief personnel were not normally expected to remove outdated stock when they covered for someone, unless the stock expired while they were covering the route. Additionally, route relief generally did not perform as well as the regular sales representative either in generating orders, or in keeping the stock current in the stores. During the five-week trial, a substantial amount of expired merchandise accumulated in Perkins' accounts. Thus, when the trial ended, Perkins had a great deal of catching up to do. Perkins was not reprimanded at this time for the condition of the inventory, nor for any missing orders.

Wright did inform Perkins after his jury service that, because Carlie was not his dependent child, he could no longer drive her

this court has tried in its 13 years on the bench. It required a significant sacrifice on the part of all the jurors and their employers, as well as the government and the community.

The facts of the case were convoluted, and demanded the jury's full attention over the five weeks it took to place them in the record. Because a significant part of the testimony was contradictory, the jury was called upon to make difficult determinations of credibility in order to reach a proper verdict. In the end, this jury convicted four of the six defendants, and acquitted two. Mr. Perkins was the jury foreman, and in this court's judgment, he was an exemplary one. His performance showed no sign of what distress, if any, he may have been suffering during the trial.

2. Wright indicated that because of the distance a route relief person has to travel to fill in for an employee who is out, the company tries to schedule that person for only four days a week.

the two miles from the bus stop to their home. Perkins obeyed Wright's instructions. Wright also gave Perkins a corrective action letter dated November 30, 1992.[3] This was the first such letter he had ever received at Sara Lee. It stated:

> Per our phone conversation on November 2, 1992 you were to serve on a jury for approximately three weeks. You made two commitments to me during our conversation. You were to call me weekly during the course of the trial. You also stated that you would run day 3 calls weekly during the course of the trial. You have not communicated with me as I requested. Your failure to follow up with me has created unnecessary servicing problems, problems in scheduling, missed calls and lost sales. Effective immediately, you are to call me Monday, Wednesday and Friday nights of each week, during the course of the trial as well as when you retrun [sic] to work.

Perkins told Wright he did not agree with this corrective action letter because he had not agreed to call her weekly, and that he had tried to reach her repeatedly regarding his Day 3 calls.

There were numerous other documents in Perkins' file from during and after the trial reflecting problems Wright noted with his work, but Perkins saw none of these documents until they were subpoenaed. The first was a "Discussion Planner" dated November 18, 1992, which stated that Wright had received three complaints from Perkins' customers, that Perkins had poor habits, and that Wright had trouble contacting Perkins. During the trial, Wright called Perkins and asked him to address one of the complaints, involving an inventory control log at a 7–11 store. Another "Discussion Planner," dated December 9, 1992, stated that Wright could not contact him while he was on jury duty, and that this problem could lead to Perkins' termination. In addition, on the inventory counts that Wright and Perkins had prepared, Wright entered critical comments about Perkins on her own copy, but contrary to customary practice, never discussed the comments with Perkins.

Perkins began to fear for his job. Frances Porter, the Roses Department Store Receiving Manager, testified that Perkins informed her that he would still try to work at the store during the trial, despite having been selected for jury service. The first day Perkins called on Roses after completing jury service, Porter told Perkins that a L'Eggs employee named John Lilly had been in the store the week before to swap some items he needed for another store. She asked Lilly about Perkins and was told that Perkins in fact was not serving on a jury, but had been doing poor work and was going to be fired. Porter stated that she never had problems with Perkins leaving merchandise in the store, and that he had a good reputation for truthfulness among the delivery persons in the community.

Wright's own antipathy toward him became more and more obvious to Perkins as time went on. In January, 1993, Perkins was required to attend a company meeting at Lake Caroline, the subdivision where Wright had her new home. When he arrived at the gate on the morning of January 21, he learned that Wright had left his name off the list of people authorized to attend the meeting. There were only 8–10 people working for Wright who were to attend that meeting, and Perkins took Wright's ostensible oversight as a slight.

A few days before the Lake Caroline incident, on January 18, 1993, Wright rode with Perkins on his rounds and discussed with him a number of areas where she felt Perkins fell short. On that day, Wright noted that Perkins was not wearing the company uniform or safety shoes, and he had parked in a fire lane. Both incidents were the subject of an oral reprimand to Perkins, and on January 25, 1993 that reprimand was memorialized in a memorandum Wright neglected to share with Perkins. Perkins was never asked about any accumulated stock in the stores he and Wright visited on January 18.

---

**3.** Though Wright gave him the letter in December, she apparently read it to him over the phone on November 30. The issue of Perkins' niece also appears to have been raised and decided in that phone conversation.

Perkins testified that the reason he was not wearing a uniform was that he had put on weight and no longer fit into the uniforms provided. His safety shoes were also too tight. He ordered new uniforms in July, 1992, but had never received them. Perkins had received a point reduction on his July 16, 1992 evaluation for failing to wear a proper uniform, nametag, and footwear. But again, he had been permitted to wear a shirt and tie with normal shoes for months, without comment from his supervisor.

Wright's reprimand for parking in a fire lane was also a surprise to him. Wright had been following Perkins in her car. After she made a personal stop at an office supply store, Wright parked in the front lot at Fashion Square Mall in Charlottesville, and met Perkins at the Rite–Aid Drug Store. After making the call, they both went to the back parking lot where Perkins had parked his delivery van in the fire lane. Perkins explained that all delivery vehicles servicing Fashion Square Mall parked in that spot. When a county policeman happened by, Wright spoke with him about Perkins parking in the fire lane. He laughed, saying that no one would write a ticket for parking in the fire lane. Wright reprimanded Perkins just the same, and the parking infraction also made its way into the January 25 memorandum.

Reflected in another of Wright's January 25 memoranda was a pair of complaints from customers on Perkins' route. Wright brought the complaints to Perkins' attention orally, which he felt was appropriate. He was surprised to find, however, that he had been "written up" for these ordinary customer complaints, which in his experience did not call for a memorandum to the personnel file.

Finally, following yet another review of Perkins' inventory on January 22, 1993, Wright noted that Perkins had processed a change of address incorrectly on a billing document, and told him he had to be retrained. Though Perkins felt this "retraining" was really some sort of punishment, he nevertheless spent January 27 and 28, 1993 retraining in Fredricksburg, Virginia.

On January 29, 1993, Perkins wrote a 5–page letter to the court explaining all that had transpired with his employer. The court forwarded the letter to the First Assistant United States Attorney, Morgan E. Scott, Jr., who contacted Mr. Kaiser, Ms. Wright's supervisor, on February 9 or 11, 1993. At that time, Scott informed Kaiser of the provisions of the Jury Systems Improvements Act of 1978, codified as amended at 28 U.S.C. § 1875 (1982).

Over the course of these events, Perkins developed serious headaches, gastritis, and high blood pressure. On February 1, he went to Charlottesville Family Medicine and was advised to take a couple of days off from work.

On February 1, the same day, Wright demanded the immediate return of a rental van Perkins had been provided when his company vehicle was damaged in an accident on December 28, 1993.[4] Wright told Perkins that his van had been repaired. Perkins indicated that he would drive the rental van to meet Wright, or that Wright could send someone for it, but that he was not willing to allow anyone from the company to come to his home to retrieve the van. Citing insurance considerations, Wright nevertheless called the state police and the post office for directions to Perkins' home, and appeared there the next day with another employee. Perkins refused to surrender the van, but was not fired for his insubordination. Wright left the property at that point, and returned later with Mr. Kaiser, her supervisor. On the way to Perkins' house, Kaiser and Wright found the van parked by the road with the keys locked inside. After much effort over the next several hours, Kaiser and Wright managed to retrieve the van.

Perkins received a certified letter from Kathy Walsh, Human Resources Manager for L'Eggs, asking Perkins to call her regarding his disability. The letter was dated February 8. Perkins called Walsh and talked with her for hours regarding what he perceived as Wright's harassment, which he believed stemmed from his jury service. The company once more refused to place Perkins

---

4. Perkins was not faulted for the accident.

under another supervisor, and denied his request to view his personnel file. Perkins returned to Charlottesville Medical Center on February 10, 1993, and after testing revealed that he was suffering from situational stress and stress-related gastritis, the attending physician advised that Perkins would be unable to work until February 25.

On February 15, 1993, Perkins was first suspended, then fired for his inability to service all assigned accounts on his route. The termination was based ostensibly on a letter from Greg Crooks, a manager at K–Mart. Back in January, 1993, before Perkins left on sick leave, Crooks told Perkins to get the old shippers out in time for K–Mart's January inventory. This was the first time Crooks had seen Perkins since the end of the trial. That very day, Perkins removed $1,040 worth of old merchandise from K–Mart and told Crooks that the company would send a truck to pick up the remaining shippers. Perkins told Wright that whoever was covering him had not taken out the old shippers, though a relatively small portion of the shippers had been in the store since before Perkins' jury service. K–Mart was a Day 3 call scheduled every other week, and all sales merchandisers had received a company memorandum directing them not to make special trips to pick up excess stock at K–Mart. Nevertheless, Perkins asked for Wright's help in getting the old shippers out, knowing that the company had sent a truck from Richmond in similar cases before. Having alerted his supervisor and having been admonished not to make any special trips to pick up these shippers, Perkins forgot about the problem, confident that Wright would follow through on Crooks' request.

Wright disputed that Perkins told her there was excess stock at K–Mart, or that a special trip was necessary to retrieve it. She stated that L'Eggs would send a display merchandiser only to pick up a substantial amount of excess. She took no action to mitigate this problem either before or after the K–Mart inventory.

On February 11, 1993, another employee substituted for Perkins while he was on sick leave, and removed $1,800 worth of outdated merchandise. Crooks called Wright and told her that he did not want Perkins back in his store because Perkins had reneged on his promise to send a truck to pick up excess stock in time for K-Mart's inventory. As a result, Crooks was forced to employ several unnecessary man hours to count the inventory.[5] Crooks stated that Perkins was a good employee, but that he was just not removing the excess product. At trial, Crooks admitted that when he made his complaint, he was unaware that Perkins had been serving on a jury for 5 weeks.

Indeed, Wright did not tell Crooks that Perkins had been out on jury duty, and that route relief had neglected to remove the outdated stock. Nor did she inform Crooks that it was her responsibility to send a truck for the accumulated stock. Instead, Wright told Crooks to write out his complaint and fax it to her. On February 15, 1993, Kaiser and Wright first suspended Perkins, then visited Crooks. They told Crooks that they had been having trouble with Perkins. They never asked Crooks if L'Eggs could do anything to permit their employee, Perkins, to return to K–Mart. Perkins was terminated.

At the time he was fired, Perkins earned $840 from Sara Lee every two weeks. He had disability coverage, medical and dental coverage for himself, his wife and daughter, and a tuition refund program. After he was fired, he could not afford individual medical insurance.

Sara Lee has pointed out that Perkins travelled to Maryland to visit his wife's family during the period of his disability, which was to have been between February 1 and February 25, 1993. Perkins also continued to work at the Trading Post during that period, recording either 46.5 or 58.5 hours between January 30 and February 11, 1993, and 55.5 hours between February 12 and February 24, 1993. Sara Lee states that it is its policy to terminate employees who work for other employers while on disability leave from Sara Lee, and that Perkins would have been fired for this reason even if all of his other travails were ignored.

---

5. Two K'Mart employees purportedly spent 3½ to 4 hours counting the additional L'Eggs stock.

The court sees nothing in either Perkins' recreational trip to Maryland or in his continued employment at the Trading Post that is inconsistent with the disability Sara Lee granted him. It is to be expected that Perkins would address a stress-related illness by spending time with family and friends. As for his other job, the court sees no indication in the record that Sara Lee warned Perkins about continuing that employment, though it had known for some time that Perkins had held this second job. In fact, Perkins worked at the Trading Post while on leave from Sara Lee for jury duty, and was not questioned for doing so. The work at the Trading Post was simply not as stressful for him as his work at Sara Lee had become. And though his average hours at this other job increased in the early part of 1993, they did not increase so much as to suggest that Perkins was taking advantage of his disability status with Sara Lee. It should be noted in this regard that Perkins' disability pay from Sara Lee was substantially less than his ordinary wages. For all these reasons, the court is not persuaded that Sara Lee would have terminated Perkins for his activities during his disability period.

## II.

The Jury Systems Improvements Act of 1978, codified as amended at 28 U.S.C. § 1875 (1982), provides for monetary and injunctive relief, as well as a civil penalty for discharge or threatened discharge of an employee by reason of such person's federal jury service. *Shea v. County of Rockland,* 810 F.2d 27, 28 (2d Cir.1987). Section 1875 states, in pertinent part,

(a) No employer shall discharge, threaten to discharge, intimidate, or coerce any permanent employee by reason of such employee's jury service, or the attendance or scheduled attendance in connection with such service, in any court of the United States.

(b) Any employer who violates the provisions of this section—

(1) shall be liable for damages for any loss of wages or other benefits suffered by an employee by reason of such violation;

(2) may be enjoined from further violations of this section and ordered to provide other appropriate relief, including but not limited to the reinstatement of any employee discharged by reason of his jury service; and

(3) shall be subject to a civil penalty of not more than $1,000 for each violation as to each employee.

(d)(2) The court may tax a defendant employer, as costs payable to the court, the attorney fees and expenses incurred on behalf of a prevailing employee, where such costs were expended by the court pursuant to paragraph (1) [authorizing the court to appoint counsel upon finding probable merit in the claim]....

■ The statute's purpose is clear: to protect jurors in their employment in every way while they are on federal jury service. The statute does not contemplate that the juror must change his working conditions; instead, it protects the juror from any deprivation by his employer during or because of his jury service. *United States ex rel. Madonia v. Coral Springs Partnership,* 731 F.Supp 1054, 1056 (S.D.Fla.1990). It is particularly critical that a juror not be distracted by concerns for his job security, for harm to customers occasioned by his employer's failure to provide backup, or for any unmet responsibilities at work while he is serving on a jury.

■ The evidence adduced in this action shows that Sara Lee—through Mr. Kaiser and Ms. Wright—violated the provisions of 28 U.S.C. § 1875 on at least five occasions, forming a clear pattern of prohibited activity. First, the company pressured Perkins to submit a materially misleading statement to the court in an attempt to avoid jury duty. That statement and the comments of Sara Lee's witnesses at trial reveal Sara Lee's attitude toward the participation of its employees in jury service. Second, the company required Perkins to work during his jury service after he had indicated he could not do so. It is true that Perkins voluntarily committed to run his Day 3 calls, but he made the commitment based on Trish Wright's representation that route relief was unavailable, and properly withdrew that commitment when he be-

came aware of the demands of his jury service. Third, the company required Perkins single-handedly to correct five weeks of neglect on his customer accounts, neglect which was occasioned only by his absence due to jury service. Fourth, in retaliation for his jury service, the company took away his autonomous and relaxed working conditions by forcing him to comply with company policy at its whim, by subjecting him to excessive written criticism, and by embarrassing him with punitive retraining and inappropriate intrusions onto his property. Finally, again in retaliation for his jury service, Sara Lee fired Perkins.

■ Sara Lee offers two defenses, both based on company policy. First, Sara Lee states that it is company policy to terminate sales merchandisers who cannot service all stores on their routes. Even assuming that such a policy exists and is uniformly enforced, it is ultimately unavailing. By far the largest portion of Perkins' failure to service Sara Lee's customers adequately was brought about by Sara Lee's inability or refusal to provide the necessary route relief. Having forced Perkins alone to make up for five weeks of poorly tended accounts, it will not now be heard to justify his termination by pointing to his failure to service his customers.

■ Sara Lee next contends that Perkins would have been fired in any event for working a second job while on disability leave from Sara Lee, in violation of another company policy. This is an "after-acquired evidence" defense of the sort recognized by the Fourth Circuit in *Smallwood v. United Airlines, Inc.,* 728 F.2d 614 (4th Cir.), *cert. denied,* 469 U.S. 832, 105 S.Ct. 120, 83 L.Ed.2d 62 (1984). Though the court's research reveals no application of this doctrine to cases under 28 U.S.C. § 1875, it need not decide whether any such extension of the doctrine is appropriate. Indeed, as the court has already indicated, no such disability policy was explained to Perkins, despite his general openness with the company about the

second job and his need for the extra income. On the facts of this case, it is clear to the court that Perkins would not have been terminated for his activities while on disability leave.[6] Thus, Sara Lee's "after-acquired" evidence, if indeed after-acquired at all, suggests to the court no reason to deny relief in this case.

In response to the court's customary letter to each juror who has served before this court, Perkins replied:

In your letter of December 31, 1992, you asked if we had any suggestions concerning how the jury system might be improved. In light of what has happened to me during this process and after talking to other jurors after the trial, I feel that more needs to be done educating employers of the responsibility of every citizen to serve if asked. Employers need to recognize that this is all part of a system that has worked in these United States. And this system is the same one that insures that there is freedom in business that allows companies to operate without undue government intervention. The trial process for a juror is [sic] difficult one since much energy is spent listening to facts that will have a potential effect on someone elses [sic] life. The last thing a jury member should have on their [sic] mind is weather [sic] there is going to be ramifications by the employer if there is extended time spend [sic] serving on a jury.

Congress agrees, as does this court. Section 1875 creates not only a private cause of action but also a "duty imposed upon employers ... [that] runs not only to the employee but even more importantly to the United States and its citizens in protecting the judicial process and the right to trial by jury." H.R.Rep. No. 1652, 95th Cong., 1st Sess. 15 reprinted in 1978 U.S.Code Cong. & Ad. News 5477, 5488 (quoting Devlin, Trial by Jury, at 164 (1956)). Therefore, violation of § 1875 causes injury not only to an individual plaintiff, but also "to the United States and its citizens."

---

6. The court notes parenthetically that it would be particularly unseemly to punish Perkins for alleged transgressions while he was suffering from a condition potentially brought on by Sara Lee's treatment of him. The court renders no finding, however, on this issue of causality and it plays no role in the outcome of the case.

## III.

By reason of the foregoing, this court finds that defendant Sara Lee has violated 28 U.S.C. § 1875 on five occasions, forming a clear pattern of prohibited activity. The most serious of these is Perkins' termination, for it came only days after Assistant United States Attorney Morgan Scott placed Sara Lee on notice regarding the requirements of § 1875. For this violation, Sara Lee shall be assessed the maximum statutory penalty of $1,000. The other violations are serious as well, but in the court's judgment they are not serious enough to call for the statutory maximum. For each of these four remaining violations, Sara Lee shall be assessed a statutory penalty of $500. Sara Lee is hereby enjoined permanently from further violations of 28 U.S.C. § 1875, and is warned that this court is prepared to address any future encroachment on Mr. Perkins' federally protected rights.

In addition, Sara Lee shall reinstate Mr. Perkins to his former position, with the same seniority, benefits, and rate of pay Perkins would have commanded in that position had he never been discharged. Sara Lee shall compensate Mr. Perkins for all wages and/or benefits lost between the date of his firing and the date of his resumption of his former employment, and shall place Mr. Perkins under a new supervisor within the company.

Lastly, Sara Lee shall pay the reasonable costs of this action, including reasonable attorney's fees for Mr. Perkins' court-appointed counsel.

An appropriate order shall this day issue.

## ORDER

As more fully set forth in an Opinion entered on even date herewith, this court finds in favor of the plaintiff on his claim for violations of 28 U.S.C. § 1875. Accordingly, as described in the accompanying Opinion, it is this day

## ADJUDGED AND ORDERED

that:

1) Defendant Sara Lee Corporation shall be, and it hereby is, assessed a statutory penalty in the total amount of three thousand dollars ($3,000);

2) Defendant Sara Lee Corporation shall be, and it hereby is, permanently enjoined from any further violations of 28 U.S.C. § 1875;

3) Defendant Sara Lee Corporation shall reinstate plaintiff Andrew Perkins to his former position, with the same seniority, benefits, and rate of pay Perkins would have commanded in that position had he never been discharged;

4) Defendant Sara Lee Corporation shall compensate plaintiff Andrew Perkins for all wages and/or benefits lost between the date of his discharge and the date of his resumption of his former position;

5) Defendant Sara Lee Corporation shall place plaintiff Andrew Perkins under a new supervisor within the company;

6) Defendant Sara Lee Corporation shall pay the reasonable costs of this action, including reasonable attorney's fees for plaintiff Andrew Perkins' court-appointed counsel;

7) This case shall be, and it hereby is, dismissed and stricken from the docket of this court.

The Clerk of the Court is hereby directed to send a certified copy of this Order and the accompanying Opinion to all counsel of record.