**In re Katherine BREGAR, a Member of a Special Grand Jury.**

**No. General Order 07–006.**

United States District Court, N.D. Illinois, Eastern Division.

March 14, 2007.

*MEMORANDUM OPINION ACCOMPANYING GENERAL ORDER*

HOLDERMAN, Chief Judge.

Katherine Bregar ("Bregar"), a member of a Special Grand Jury of this district, has informed this court that she believes she was terminated from her employment at Cornerstone Services, Inc. ("Cornerstone"), located in Joliet, Illinois, due to her grand jury service. After conferring with supervisory personnel of the U.S. Attorney's Office for the Northern District of Illinois, who declined the court's request to look into the matter, the court informed Cornerstone in writing of Bregar's claim and asked Cornerstone to provide the court a response. The court has received that response and has evaluated all the information presented. Based on the available information, the court finds probable merit on Bregar's claim.

Bregar was sworn-in as a member of a Special Grand Jury on August 11, 2006. Cornerstone terminated her employment on August 28, 2006. Bregar began her work at Cornerstone in May 2003, after receiving a bachelor of science from Iowa State University. Recently, Bregar served as a Case Manager until her employment with Cornerstone was terminated. Bregar brought to this court's attention on December 19, 2006 her belief that she was terminated based on her grand jury status. The court interviewed Bregar about her claim of discrimination on January 23, 2007. That same day, the court sent a letter to Cornerstone apprising Cornerstone of Bregar's claim and Title 28, United States Code, Section 1875. The court in that January 23, 2007 letter requested that Cornerstone provide the

court a written statement and documentation of the circumstances regarding Bregar's termination by February 16, 2007. Cornerstone responded to the court's request in a timely manner with a letter but provided no documentation. The court sent a second letter dated February 16, 2007, requesting relevant documentation again, Cornerstone complied by sending copies of documents regarding Bregar's job performance and termination.

## FACTUAL BACKGROUND

The court calls the factual background set forth from the information and documents provided by Bregar as well as the materials submitted to the court by Cornerstone.

Bregar graduated from Iowa State University with a bachelor of science in May 2003 and started working at Cornerstone, a nonprofit social service organization located in Joliet, Illinois that helps people with disabilities and mental health issues live as independently as possible in communities. When she began working at Cornerstone, Bregar held the position of Community Housing Case Manager and Brenda Smith ("Smith") was her supervisor. In 2004, after Bregar had been at Cornerstone for about a year, Smith gave Bregar a positive performance evaluation. Bregar said that she did not receive another performance evaluation while working at Cornerstone, and Cornerstone did not furnish any performance evaluation in the documentation provided to the court regarding Bregar.

In April 2005, Bregar was promoted to Case Manager through Housing Opportunities for People with AIDS ("HOPA"). As a case manager, Bregar participated in group therapy with her clients, focusing on mental illness, substance abuse and the impact on the psyche of having a terminal illness. Bregar also made sure that the clients got to their appointments, managed medication, consulted with psychiatrists, assisted with medicaid billing management, and provided individual therapeutic behavioral services, such as teaching the clients how to do certain tasks. At the time of Bregar's termination, Bregar still held the position of case manager and Smith, a coordinator, was again her direct supervisor. Dianna Watson ("Watson") was the director of Behavioral Health.

According to Bregar, she first received notice of her possible grand jury service, when she was mailed a questionnaire in early July 2006. Around July 6, 2006, Bregar showed the questionnaire to her supervisors at Cornerstone, Smith and Watson. Bregar remembers their reaction as being annoyed, but unconcerned because they did not believe she would be selected as a grand juror. As the next step in the grand juror selection process, Bregar received a summons asking her to appear in court on August 11, 2006. Shortly after receiving the summons, Bregar presented the summons for grand jury service to her supervisor, Smith, while they were both in the office of another case manager, Brianne Carter. According to Bregar, Smith reacted with annoyance, but still did not believe that Bregar would be selected to serve. Bregar recalls Smith asking Bregar, "Can't you get out of this? Can't you get a letter or something saying that you can't do it?" Bregar responded that she could not get out of grand jury service. According to Bregar, after she received the summons to appear for grand jury service, Bregar began to be brought into Smith's office for purported disciplinary reasons.

Bregar provided the court a chronology of events following her telling Cornerstone of her receipt of a grand jury summons. On August 8, 2006, Bregar visited the home of a client, "C.," [1] as part of Bregar's

1. The court uses the abbreviation "C." to refer to the client in order to maintain the confidentiality of the client's identity.

individual behavioral therapy responsibilities, and helped C. organize her belongings while discussing C.'s "stressors." On August 10, 2006, Watson wrote up Bregar because Bregar's voicemail on her company cell phone was not working and suspended Bregar for that offense for one day. On August 11, 2006, Bregar appeared at the federal courthouse in Chicago in response to the grand jury summons. She was selected for grand jury service that day and was told that the grand jury would meet every Tuesday. Bregar's first day of grand jury service was Tuesday, August 15, 2006. On the following day, August 16, 2006, Bregar served her one-day suspension from Cornerstone.

The next day, Thursday, August 17, 2006, Bregar led a morning group therapy session and again visited the home of C. to help C. organize her belongings and to begin to clean her house, as well as to discuss "ongoing stressors." The next day, Friday, August 18, 2006, one week after Bregar's selection as a grand juror, her supervisor Smith informed Bregar that Smith was investigating Bregar for allegedly verbally abusing clients during the August 17, 2006 group therapy session. Bregar informs the court that Bregar received telephone calls from clients after that. These clients told Bregar that they questioned the reason for the investigation and expressed their concern for Bregar's job stability. On the following Monday, August 21, 2006, Smith notified Bregar of an upcoming "random" inspection of C.'s residence, and so Bregar went to C.'s residence to help C. organize and clean her house.

After again performing her grand jury service on Tuesday, August 22, 2006, Bregar returned to work on Wednesday, August 23, 2006. On that day, Smith and Watson told Bregar that they had concluded their investigation with a finding that Bregar had not verbally abused her clients on August 17, 2006. Nonetheless, Smith and Watson informed Bregar that she would be suspended on August 24, 2006 for not timely submitting Bregar's daily paperwork to Smith to proofread. In response, Bregar recalls explaining that she was having difficulty timely submitting the paperwork now that she had one less day, due to her grand jury service, to perform the mandatory 15 to 20 hours per week of client contact billing. Bregar requested the accommodation that her supervisors lower her billing quota or allow her to have a "paper work day." According to Bregar, Watson responded that Bregar had already been granted too many favors.

On Friday, August 25, 2006, a home inspection of C.'s residence was conducted by Smith and property manager, Pat Rosel ("Rosel"). It appears from Bregar's notes that she also was at the inspection. According to Bregar, C. and Bregar had been working on organizing the house and had just started the cleaning process. Bregar also recalls speaking to Rosel about necessary repairs to the residence and informed Smith and Rosel that Bregar had been in touch with the client's landlord about the needed repairs.

After Smith's August 25, 2006 inspection of C.'s residence, Bregar was terminated on Monday, August 28, 2006. Smith, in the presence of Susan Murphy ("Murphy"), the Human Resources director, informed Bregar that she was neglectful due to the condition of C.'s home. In addition, Smith stated that the homes of two other clients of Bregar's were also in poor condition and in need of repairs. According to Bregar, she responded to Smith by explaining that no baseline was ever measured of these clients' homes before the clients were added to Bregar's caseload, and there was no method to determine the

clients' progress or regression under Bregar's care. Bregar asserts that she offered to show Smith and Murphy the progress notes and housing inspections that showed Bregar's efforts but Bregar was not permitted to review the case files of her clients. Instead, Bregar claims that she was told her termination was not a bargaining situation and the decision was final. Bregar also asserts that she was not allowed to make changes to what she believe to be an erroneous write-up. Bregar was told to sign the write-up, pack her belongings, and leave the Cornerstone premises. Bregar was not provided with any written materials related to disciplinary action taken against her or her termination.

Cornerstone's version of events contradicts some of, but not all, Bregar's allegations. Cornerstone denies that Bregar's termination had anything to do with her grand jury service. According to Cornerstone, the organization was aware of her service and its obligation to allow employees protected time off to serve on juries. Cornerstone asserts that it is in full compliance with its legal obligations regarding grand jury service and was able to easily accommodate Bregar's grand jury service. In addition, Bregar's and Cornerstone's accounts of the chronology of Cornerstone's discipline of Bregar during August 2006 generally match, but some dates are different.

Cornerstone contends in its February 7, 2007 letter to the court responding to the court's request for information, that Bregar's termination was "straightforward." According to Cornerstone, Bregar was terminated in accordance with Cornerstone's progressive disciplinary process. Bregar was first verbally counseled in February 28, 2006, for failure to complete billing notes. On April 13, 2006, Bregar received her first written warning for allowing a client to live in sub-par conditions without appropriate intervention.[2] In addition, Cornerstone issued Bregar a written personnel memorandum dated July 11, 2006, regarding her tardiness on three occasions in June and an unauthorized absence on July 5, 2006. Cornerstone also recounts that, at the time Bregar was notified of her first one-day suspension on August 14, 2006 for lack of responsiveness to client and supervisor telephone calls as well as failure to submit complete billing notes, Bregar was told her job was in jeopardy.[3] It appears from Cornerstone's documentation that the subsequent inspection of C.'s apartment occurred on Friday, August 18, 2006, rather than Friday, August 25, 2006, as Bregar recollects. Although the documentation provided by Cornerstone corroborates the inspection date as August 18, 2006, as opposed to August 25, 2006, both Bregar and Cornerstone confirm that Bregar was given two-days notice of the inspection.

In Cornerstone's response to Bregar's claims, Cornerstone provides additional detail regarding Bregar's termination. According to Cornerstone, Bregar was terminated because of her client's apartment was "in complete disarray, was filthy, and had not been cleaned for many, many months." (Cornerstone letter, Feb. 7, 2007.) Cornerstone alleges that the community landlord alerted Bregar's supervisors to the situation, which led to a site inspection. Despite the two-days notice that Bregar received regarding the site

---

**2.** The court notes that Bregar responded in the negative when asked by the court in her interview if she had received prior disciplinary warnings or notices before receiving her grand juror notice.

**3.** From the documentation provided by Cornerstone and Bregar's recollection, it is unclear from the record before the court if Bregar was given two one-day suspensions or a singular one-day suspension.

inspection, Cornerstone claims that the apartment was nearly uninhabitable. According to paperwork for Bregar's termination, Bregar was terminated for neglect of duty.

The court has reviewed the information provided by Bregar and Cornerstone to determine whether Bregar's claims of discrimination based on her grand jury service have probable merit such that the court should appoint counsel to represent Bregar in any action in the district court necessary to the resolution of Bregar's claim.

### LEGAL STANDARD

In 1978, Congress enacted 28 U.S.C. § 1875 to accord statutory protection to the employment status of federal jurors during jury service and to give federal district courts original jurisdiction under 28 U.S.C. § 1363 to hear civil claims brought by jurors alleging wrongful termination in retaliation for jury service. H.R. Rep. 95–1652, 95th Cong., 2d Session (1978), 1978 U.S.C.C.A.N. 5477. Previously, courts had used their contempt powers to punish employers that had retaliated against employees, but relying on contempt powers had been ineffective because jurors were frequently reluctant to report the intimidation or threats and employer action was purposefully designed to evade an effective response by the courts. *Id.* Section 1875 performs several functions to protect jurors from unlawful termination. The statute puts employers on notice of their legal duties, offers employees assurances that their rights are protected by the law, and gives district courts explicit jurisdiction to hear the matters.

Section 1875 creates a statutory right of protection for federal jurors' employment, stating that "[n]o employer shall discharge, threaten to discharge, intimidate, or coerce any permanent employee by reason of such employee's jury service, or the

attendance or scheduled attendance in connection with such service, in any court of the United States." 28 U.S.C. § 1875(a). Under the statute, a juror is entitled to damages for any loss of wages or other benefits suffered due to a violation. *Id.* § 1875(b)(1). Furthermore, the court may enter injunctive relief, such as reinstatement of a juror's employment. *Id.* § 1875(b)(2). A civil penalty of not more than $1000 per violation may be imposed on the employer as well. *Id.* § 1875(b)(3).

In the protecting of an individual juror's employment, § 1875 has been interpreted to apply to the failure of an employer to accommodate the schedule of an employee who is performing his grand jury service. This is based on the statutory language prohibiting an employer from "intimidat[ing] or coerc[ing] any permanent employee by reason of such employee's jury service, or the attendance or scheduled attendance in connection with such service." 28 U.S.C. § 1875. In an opinion that was later voluntarily vacated by the district court judge after the parties settled, *United States ex. rel. Perkins v. Sara Lee Corp.,* 852 F.Supp. 1321 (W.D.Va. 1994), the district judge recognized that the "statute [§ 1875] does not contemplate that the juror must change his working conditions; instead, it protects the juror from any deprivation by his employer during or because of his jury service." *U.S. ex rel. Perkins v. Sara Lee Corp.,* 839 F.Supp. 393, 401 (W.D.Va.1993). In addition, the district judge in *Perkins* noted that "It is particularly critical that a juror not be distracted by concerns for his job security ... or for any unmet responsibilities at work while he is serving on a jury." *Id.* Another district judge has also held that the purpose of § 1875 is to protect jurors from concerns and distractions related to their wages, seniority status, other benefits, and working conditions, including a deprivation by the employer via a detri-

mental change in one's schedule. *United States ex. rel. Madonia v. Coral Springs Partnership, Ltd.,* 731 F.Supp. 1054, 1056–57 (S.D.Fla.1990).

Upon application by an individual claiming wrongful termination based on his or her juror status, the court may appoint counsel for the individual if the claim is found to have "probable merit." 28 U.S.C. § 1875(d)(1). Appointed counsel "shall be compensated and necessary expenses repaid to the extent provided by section 3006A of title 18, United States Code," the statute addressing payment of appointed counsel for criminal defendants. *Id.* Additionally, should an employee prevail, the court may award attorney's fees to the employee pursuant to 28 U.S.C. § 1875(d)(2).

## ANALYSIS

The court's role in this situation is to assess whether there is or is not probable merit to support Bregar's claim that Cornerstone discriminated against Bregar based on her grand jury service. Given the nature of this rather low standard, the court finds based on the facts in the record that there is probable merit to Bregar's claims.

The temporal proximity of Cornerstone's disciplining Bregar to the commencement of Bregar's grand jury service raises suspicion. Prior to July 2006, when Cornerstone found out that Bregar may be picked to serve on a grand jury, Bregar had been disciplined twice in two years (according to Cornerstone) in her position as a Case Manager at Cornerstone. Additionally, Bregar had received a positive performance evaluation the last time she had been officially evaluated in 2004.

On July 6, 2006, Bregar alleges that she showed her supervisors the grand juror questionnaire that she received, and Bregar was then given a written disciplinary notice five days later on July 11, 2006 regarding tardiness and an unauthorized absence. Once Bregar was notified that she may be serving on the Special Grand Jury, Bregar was disciplined three times and then fired just days later, all within less than three weeks of the commencement of her actual grand jury service. Although Cornerstone has provided documentary evidence to support its position that Bregar was terminated in accordance with Cornerstone's progressive disciplinary process, the court cannot ignore the escalation in Cornerstone's disciplinary process following Cornerstone's receiving notice of Bregar's grand jury service.

Further, there is evidence from which an inference can be drawn that some of what Cornerstone asserts were Bregar's performance problems is pretextual. It also may have been the result of Cornerstone's failure to accommodate Bregar's grand jury service. *See Perkins,* 852 F.Supp. at 1321; *Madonia,* 731 F.Supp. at 1056–57. Bregar raised a concern to her supervisor in response to the criticism that she was late submitting daily paperwork that Bregar was unable to accomplish all of her duties with one less day in the work week due to her grand jury service. Yet, it appears at this point that Cornerstone's Watson responded to Bregar's concern by stating that she had already been granted too many favors. Also unclear is whether Watson was referring to Cornerstone's allowing Bregar to serve her grand jury duty as a "favor."

Additionally, Bregar has reported that her supervisor Smith, who later terminated her, responded negatively to Bregar's receipt of a grand jury notice and asked Bregar if she, Bregar, could "get out" of serving as a grand juror. Based on the record at this point, the court concludes there is sufficient support for a finding of probable merit as to Bregar's claim of discrimination based on her grand jury service.

In making this ruling that there is probable merit that Cornerstone violated § 1875, the court emphasizes that this finding is based on a preliminary evaluation of Bregar's claim and constitutes a preliminary finding that Bregar's claim is likely but is not certain to have merit.[4] Appointed counsel should undertake a further prefiling investigation to make a determination consistent with Federal Rule of Civil Procedure 11 of whether a civil suit should be filed.

## CONCLUSION

The court orders the appointment of counsel for grand juror Katherine Bregar pursuant to 28 U.S.C. § 1875 and appoints attorney Lisa Kane to represent grand juror Katherine Bregar in her claim of discrimination against her former employer, Cornerstone Services, Inc. Appointed counsel is requested to contact Katherine Bregar.

---

4. The term "probable" is defined as "likely, but uncertain; plausible." *See* probable. Dictionary.com. The American Heritage® Dictionary of the English Language, Fourth Edition. Houghton Mifflin Company, 2004, *available at* http://dictionary.reference.com/browse/probable (January 24, 2007).